Lipscomb, J.
This suit was brought by the appellaut against the appellee to recover a certain lot of gromul and a negro girl. The petition alleges that said property was bought and paid for by' the' plaintiff; that the title was in the name of one Adam Smith, who acted as her trastee; that she, during Smith’s life, controlled tho said property and enjoyed the nse and profits thereof, without any claim on the part of Smith to tiie same so long as Smith lived, and that ailer liis deatli the defendant, as administrator of Smith, got possession of the property and withholds it from her, &c. At the May Term, 18-10, the defendant in liis proper person answers by a general denial. At the Pali Term following the defendant had leave to amend liis answer, and amended by—
1st. A general demurrer.
2d. That the plaintiff was at the time of tho commencement of her suit, and still is, the slave of tho, defendant’s intestate’s estate.
3d. A general denial.
4111. That the plaintiff was for many years previous to and at the death of defendant’s intestate a slave in his possession, purchased for a valuable consideration ; never was manumitied, but still is the slave of said estate.
5th. The statute of limitations of two years.
Cth. That the property sued for, land and negro, is the property of the estate of defendant’s intestate, bought and paid for by him.
The plaintiff', by counsel, filed exceptions to the 1st, 2d, 4th, 5th, and iff'.i pleas, on the ground that they were filed too late and were irregular and wholly insufficient in law. Afterwards, but at the same term, the defendant filed an amended answer, viz:
7th. That the plaintiff, at the time that she alleges she acquired title to the *269 property sued for, was a slave for life, and incapable of holding property, and that it is the property of the estate of defendant’s intestate. This last answer was excepted to by the plaintiff’s counsel.
The plaintiff’s exceptions to the defendant’s pleas coming on to be heard by the court, the exceptions were sustained to the 1st, 2d, 4th, 5th, and 7th pleas and overruled to the 6th plea.
There being no plea but the 3d, which was a general denial, and the 6th, which alleges that the property sued for, land and negro, is the property of the estate of defendant’s intestate.
The correctness of the decision of the court in overruling the pleas of the defendant has not in this case been brought before us for revision. The record immediately after the judgment of the court on the exceptions to the defendant’s pleas proceeds : The parties being at issue, thereupon came a jury, and giviug their names, continues, who being duly sworn and having heard the evidence, the following issues were submitted to them, viz :
1st. Was the negro girl purchased of Dolan or of Dolan and Clipper by the plaintiff or by Adam Smith ?
2d. Was the ten-acre lot purchased by the plaintiff or by Adam Smith?
3d. In the purchase of the said property did Adam Smith act as the trustee?
4th. Were the titles to the said property or any part thereof made to Adam Smith in trust for the plaintiff?
5th. What is the value of the negro girl Puss?
6th. What is the value of Puss from the 1st November, 1S46, to this time?
7th. Was the plaintiff the slave of Adam Smith?
8th. If you find that she was tlie slave of Adam Smith, when did she become so, and how long did she remain so?
Whereupon the jury find as follows :
To the 1st issue they answer Adam Smith.
2d. They answer Adam Smith.
3d. Tos.
4th. The title to the land was made to Adam Smith in trust for the plaintiff.
5th. Pive hundred dollars.
6th. Two hundred dollars.
7th. She was.
To the Sth issue they answer at the time of the purchase, February, 1836, and was his slave at the time of his death.
The plaintiff filed a motion to set aside the finding of tlie jury, &o.; also a motion for a new trial and in arrest of judgment; which were overruled, and judgment given for the defendant and for costs of suit, from which an appeal was taken to this court.
We liave been much more tedious in the statement of the case than could have been washed, but the record is embarrassed by so ranch irrelevant matter that it was necessary to make the above extracts for the purpose of understanding’ the questions of law that necessarily arise in the case. We do not propose to consider the errors assigned separately, hut shall endeavor (o confine onr remarks to (lie ground embraced by them. It is seen from the preceding statement extracted from the record that but two pleas went before the jury. At the time they were impaneled these formed an issue or issues by the pleading, and all the evidence ought to have been confined to them. Under onr system we have thought it very essential that the rule the allegata and the probata should concur should be firmly maintained and enforced, without permitting its effect to be paralyzed and defeated by a resort to any of the fictions of the English common-law practice. (Mims v. Mitchell, 1 Tex. R.; Coles v. Kelsey, 2 Tex. R.)
The 1st (3d on tlie record) plea of the defendant not overruled is a general denial of die allegations contained in the petition. Under this issue, according to our practice, no evidence could Ini received from the defendant but such as directly rebutted the plaintiff’s. The defendant places himself simply on the defensive, and calls on the plaintiff to make good his averments. This *270 was not the practice formerly in courts of common law governed by the English rules of procedure. Under the general issue the defendant was authorized to give various matters of defense in evidence. In England, however, under what is called Lord Tenterden’s act, no special matter of avoidance can be given in evidence without a special plea alleging such matter of defense. It is the same as our practice.
The second plea of the defendant, (Ho. 6 in the record,) according to the common-law pleading, would have been bad, because it shows no matter that might not have been available under the general issue. It only alleges that tire property sued for is the property of the estate of the defendant’s intestate for a valuable consideration paid by him. In my opinion it is bad as a special plea under our practice, in this: that it does not show in what the valuable consideration consisted, whether in money or anything else; who from; at what time; nor how much paid. It is doubtful under such a plea, if good, whether he could have been permitted to have proved anything else but a direct money payment. If the payment alleged was an indirect one, from which payment would be a legal deduction, it seems to me that the facts from which such legal deduction was derived should have been alleged. A majority of the court, however, believe that the plea was sustainable as a special plea, but all concur that as such nothing could be proved beyond what is alleged in it.
Wc have shown that the only evidence that could have been received under the issue formed by the pleadings was such only as rebutted the truth of the facts stated in plaintiff’s petition, or the truth of the fact stated in the second plea. Upon the truth of these rested Iter right to recover. Ho evidence as to the disability of the plaintiff' to sue resulting from her status as a slave was admissible, because the foundation for such proof was not laid by the alle-gata of either the petition or the plea. The introduction of such evidence was foreign to the issue made by the pleading, and was not entitled to any standing in court. It was calculated to draw the attention of the jury from the issue and to result in a verdict not responsive to it. and it was calling on the plaintiff to meet evidence that could not have been expected under the pleading. If the defendant had intended to have; relied on such defense, he should have pleaded it either in abatement of the suit or in bar. Our system of practice (not now for the first time declared from the bench) requires that each party shall make a full disclosure of the grounds on which they respectively rely for success. And it is no answer to say, when improper evidence is objected to on the ground of surprise, that the party had actual notice that such evidence would be offered, because the party cannot be called upon to prepare against evidence foreign from the issue. Hor could a verdict or judgment founded on such evidence stand in any revising judicial tribunal whatever, however direct the notice to tire adverse party may have been. (Hall v. Jones. 3 Tex. R., and cases there cited.) We have shown that under tire issue the right of the plaintiff to sue could not have been legally passed on by the court, and consequently all the testimony on this subject should have been rejected.
We will next inquire if that evidence could have been received and submitted to the consideration of the jury aside from the issue so formed by the pleading, and which the jury had sworn to try, and it may be added the only issue they were sworn to try under any aspect presented by the record in the subsequent proceedings in the ease. Prom the record it appears that after tlie jury had been sworn, and after hearing the evidence, eight distinct issues wore put to them to try. The record does not disclose by whom these issues were submitted, whether from the bench or by the counsel. But the presumption is that these after-issues were put bj' the court, as after closing the case by the argument of counsel no one had any right to submit anything fo the consideration of the jury but the judge. How this practice of putting sub-issues to the jury altogether different from and foreign to the issue formed by the pleading which the jury have been sworn to try ever received judicial *271 sanction we are unable to understand. It is not sanctioned by a fair construction of the 108th section of the act of 1846, to regulate judicial proceedings. (Hart. Dig., art. 762.) That section is nothing more than a legislative recognition of a power the court had before its enactment, aud it is a power inherent in the court and necessary to the administration of the law on the rights of parties. At common law it is believed to have been done only where immaterial issues had been formed or where the parties had not been able to form an issue. Under the complicated system of English pleading this last was not as unfrequent as those who are not familiar with that system would imagine. It was never done where the parties themselves had formed a pertinent issue. In chancery proceedings it was of very common occurrence. When a fact without which the chancellor could not form his decree so as to dispose of the case and do justice to the parties was to be ascertained, it was the constant practice to direct an issue to be made to be tried by a jury for the purpose of finding such fact. This, it was believed by this court, ought to have been done in the case of Johnston v. Loop et al. (2 Tex. R., 331.) And we remanded the case with instructions to the District Court to cause such issue to be made and tried by a jury. It was never contemplated that snob issues were to be tried different from those formed by the parties, either at law or in a chancery suit. The jury for the trial of all issues should be sworn after the issue formed, and then the evidence should bo laid before them. Issues when formed by the court should not be repugnant, foreign, or immaterial when taken in connection with the issne formed by the parties and permitted by the court to stand. A departure from this rule would be productive of much confusion and uncertainty, and would put it in the power of the judge to decide on contradictory facts as found by the jury — a difficult task to be performed.
Iu the case now before us, even had the issues been made under the direction of the court, and the jury been sworn to try them before the evidence was laid before them, they are obnoxious to many objections. In the first place, the parties had formed issues pertinent to the matter in controversy by their pleading, and them were no circumstances that required of the court to direct issues to be formed. In the second place, of the eight issues presented by the court after argument on the evidence had closed, they are all of them either repugnant, impertinent to the issues formed aud standing, or unnecessary. We "will examine them in the order they were presented. The first calls on the jury to say whether the land was purchased by Smith or the. plaintiff. This is immaterial, because it was fully embraced iu issues formed by the, pleading, and ivas therefore wholly unnecessary. The second was the same, inquiry) applied to the slave sued for by the plaintiff, and is subject t,o the. same objection as the first. The third : In the purchase, of the said property, did Adam Smith act as the trustee of the plaintiff? This is embraced in the av-r-inents of the petition, and the response is in the affirmative. The fourth : Was the title to the said property or any part thereof made to Adam Smith in trust for the plaintiff? The response is'that the title to the laud was made to Ad.irn Smith in trust for the plaintiff. These two last mentioned are both of tlrmi unnecessary, because it is but a reiteration of issues formed by the pleadings. But they in both find the truth of the plaintiff’s averment. And if any judgment could have been rendered, it could only have been for the plaintiff on the finding of these two questions in her favor, being the only ones responsive to the pleadings. The fifth and sixth are immaterial. They go to the value of the girl and of her hire, and this was embraced in the issue formed by l he pleadings. The seventh aud eighth are foreign and repugnant to the issue' made by the pleadings, and bring before the jury the question of the status of the plaintiff, and the' finding of the jury on both is repugnant to their finding on the third and fourth; because if she was a slave and belonged to Adam Smith down to the time of his death, there could be no resulting- trust in her favor. She being incapable of holding, the legal right in Smith would stand unincum-bered by' the equitable trust. Iu the third and fourth 'they find that Smith was the trustee, and that he took the title to the property in his own name as trus- *272 tec for tbe plaintiff, the finding on these being responsive to the issue they were sworn to try, and in harmony with the right asserted in the petition. The finding on tlie seventh and eighth being on foreign issues, and repugnant to the finding on the third and fourth, tlie judgment should have been for tlie plaintiff, and the finding on the seventh and eighth should have been disregarded and treated as a nullity.
If it were admitted (which, however,'it is not) that it was competent for the court to put issues to the jury after they had heard the evidence, in all reason those issues should be pertinent to the matter put in controversy by the pleadings ; and the court would not be authorized to enlarge them or to put new ones broad enough to admit evidence that could not have been received under the issue as formed by the parties themselves. The seventh and eighth of tlie judge’s issues go to the disability of the plaintiff to sue. And we have already said that this could only he set úp by a plea in abatement or in bar. Nothing; but these two last issues could have afforded any pretense for the admission of Colonel Morgan’s testimony. They being illegal, his testimony was improperly received. Any verdict found under evidence so illegally received under a false issue would he bad. as not responsive to the issue tlie jury had been sworn to try. A verdict so found could not stand nor sustain a judgment, (even aside from the illegality of the issues on which that verdict and judgment were found and rendered.) It would have been bad for repugnancy anil a want of certainty. It is manifestly repugnant in the finding on the seventh and eighth issues when compared with the finding on tlie tliird and fourth. And it is uncertain whether they intended to embrace in their finding tlie only legal issue. But all those issues put from the bench being illegal, it is very clear that the issue made "by the parties remains undisposed oE, and that tlie verdict could not support any judgment. It was error in tlie court below to refuse to set aside that illegal verdict, and it erred in rendering- a judgment on it ill favor of the defendant, when in truth, if anything- was found by it, it was the truth, of tlie plaintiff’s averments in her petition.
We have so far been engaged in the discussion of errors in practice and their consequences. And we might stop here, and reverse and remand the cause. But. there are some very important principles not yet noticed by us presented in this case; and were they passed in silence, it is most likely we should have the case again brought up for our decision on those questions. We have not, therefore, thought ourselves at liberty to decline deciding- them now.
In the court below the capacity of the plaintiff to maintain a suit or to hold any property was in an illegal way adjudicated. When this case, goes back it is likely that by an amendment of the pleading, putting that question directly in issue, it wili bo again passed on, properly presented, by tile court below. In the view that we propose to take of the questions presented and decided in this case by the District Court-, we do not believe that it will be necessary to discuss the validity of the laws passed by the Mexican authorities, either State or Federal, on the subject of slavery. It appears from the evidence in the record that in February, 1S30, the plaintiff was purchased by the defendant’s intestate. Tlie evidence is not olear whether she paid for herself or ivas paid for by Smit.ii, the defendant’s intestate. But the evidence is pretty full that from'the time of the purchase, or nearly so down to 1S-1(> Smith lived with líel-as his wife; that lie all that time disclaimed being- her owner, hut said on all occasions that she was free; that slio claimed and exe,raised ownership of properry in her own right; that Smith always called it her property, and there is but slight evidence that ho ever exerted any control over her property or her own actions; that she kept a boarding-house ; boarders always settled with her, and she bought and paid for the supplies for her hoarding-house; that the property sued for, Smith said, belonged to her, and that lie liad nothing to do with it; that on some disagreement taking place between Smith and the plaintiff he told her to take her negro and go away, that he wanted nothing *273 •more to do with her; that she did leave, taking the negro girl with her; that Smith never claimed either as his property; that Smith gave to her a paper, of which the following is a copy: ‘‘The hearer, Margaret, a negro woman, about thirty years of age, is free and at liberty to go and do the best she can to-make an honest livelihood in the world. Given under my hand this 19th day of March, 1S40. (Signed) Adam Smith.” This was given when she left him.
On the effect in law of this letter the jury propounded to the judge the following question: Is the accompanying paper evidence before the jury of the fact stated in it? To which the judge responded : ‘‘The paper referred to is evidence only of Smith’s admission that plaintiff is free; it amounts to nothing more.” The correctness of this response will be discussed. That it was an admission on the part of Smith that the plaintiff was free there can be no doubt, but whether in its legal effect it did not amount to something more is another thing. The judge seems to have thought that it did not. The legal deduction from such evidence was what the jury were in search of, and it was what should have been responded to. If it formed that kind of evidence when applied to the case that would have tended to an estoppel as a legal deduction, the judge erred in withholding his opinion upon such legal effect. That any evidence that would have estopped Smith in his lifetime would have the same effect against his administrator will not be controverted. In the case of Swenson et al. v. Walker’s Administrator, decided in this court December Term, 1848, we examined the doctrine of an estoppel with a great deal of care and attention, and are well satisfied that there may be created in law an estoppel by the acts of the party without its being so by release or by deed; that this doctrine, though questioned at first, is now too firmly established by the decisions in England and the courts of the several States of the Union to be shaken. It is called’ an estoppel in pais. Now this man, who, it seems, pever in his life claimed thé plaintiff as his slave, and by his continued acts treated her as a free woman, writes the paper referred to, in which he says explicitly that she is free and at liberty to go where she pleases. After his death his administrator attempts to show that she is the slave of the estate of his intestate. It would seem, if Smith was a party, that he would be estopped •by this acknowledgment from controverting its truth. If there was no legal impediment at any point of time after he had become the master to his relinquishing his right of property to her, and making her free by an act of his own volition, that he had freed her at that time would seem to be a legadeduction. There was no impediment until the 17th March, 1830, and the evidence shows that if he ever did own her, the title accrued before that time. Without deciding, however, whether this is an estoppel, the character of the evidence will be discussed in another branch of the opinion. If it had a tendency to any legal effect, whether called an estoppel or a presumption that everything had been done that the law requires to show that the declaration in writing, made by himself, was true, and that she was really free, such legal effect should have been declared to the jury.
The ninth section of the general provisions of the Constitution of the Republic of Texas contains on the subject of slavery the following provisions: ‘‘All persons of color who were slaves for life previous to their emigration to Texas, and who are now held in bondage, shall remain in the like state of servitude: Provided, the said slave shall be the bona fide property of the person so holding the said slave as aforesaid.” It was manifestly the intention of the convention in framing this provision to remove all doubt and uneasiness among the citizens of Texas hi regard to the tenure by which they held dominion over their slaves. The legislation of Mexico had been so fluctuating and unsettled upon this subject as to give rise to great uncertainty as to what might ultimately be adjudged on the subject of their legal titles. Although the owner might honestly believe that his legal title had not been destroyed or impaired by such legislation, he could not feel secure as to the result. Various laws and *274 decrees had been passed by Mexico, showing a disposition to interfere with' this description of property. In 1829 the President of Mexico, Guerero, by virtue of what he assumed to be his extraordinary powers, issued his decree abolishing slavery. The constitutionality of tins decree was always questioned, and on that ground, as will bo seen, was subsequently abrogated. It appears from a report made by Lucas Alamand, the Secretary of State of Mexico, to the Congress of Mexico on the 4th March, 1830, that such was the opposition to the laws in relation to slavery in Texas that any attempt to enforce them would be fruitless; that in consequence of so much dissatisfaction their operation liad been suspended so far as they related to Texas. This report of the Secretary of State no doubt produced the 10th section of the law of Mexico of the (Sth of April, 1830, as follows: “No variation shall be made in the colonies already established, nor in relation to the slaves which maybe in them. But the General Government and the Special Government of each State shall, under the strictest responsibility, require the fulfillment of the law of colonization, and that no slaves be thereafter introduced.” This would seem to be a full sanction of slavery so far as they had been introduced. By a law of 15th February, 1831, of the Congress of Mexico the decree of 1829 abolishing slavery was abrogated, fclifis giving again another sanction to the existence of slavery, which, in point of fact, had never ceased for a moment to exist defacto, if not de jure. In this state of uncertainty the question of slavery continued until the formation of the Constitution. That the true object and meaning of the provision in the general provisions was to fix and establish the title of the master, whatever may have been the legal effect of Mexican legislation to-impair that right and to nullify all Mexican legislation on the subject, there is no doubt. It conferred the absolute and legal right upon the master to his-slave then held in bondage, free from any litigation as to his legal right under the previous laws of Mexico. It also fixed the status of the person then so-held in bondage. This status was not to be affected in any degree by the proviso. That was introduced either to reserve the right of an individual who-claimed superior right and title to the slave who was not in possession of him, but in the possession of an adverse claimant, or out of abundance of caution tiie term bona fide was used to distinguish the claim by which the person so-held in bondage was claimed by his master from legal title; that if the master held him by a title that lie believed to be right and good, although it might not as a legal title stand the test of Mexican legislation, that bona fide title-should be confirmed and made legal. To give the proviso any other than one of these two interpretations would make it destroy not only its own effect, but the preceding sentence to which it is appended. It cannot by any known rule of construction be contended that the term bona fide was used as synonymous to-legal.
It will be seen from the record that to establish the condition of the plaintiff to have been the slave of Smith a period is referred to as the commencement of the relation of master and slave anterior to the formation of our Constitution. Although he may have been at one time her master, if lie disclaimed that relationship and did not claim to be her master, holding her in bondage when the Constitution was adopted, her status is not affected by it in any way prejudicial to her claim of freedom.
If such was her position, we may inquire if the paper given by Smith, although at a period long subsequent, liad not, as a matter of evidence, a tendency in law not only as an estoppel in pais to those claiming under him, but further, to create a presumption that she had been liberated by him before-any legal impediment had been interposed to his doing so. And this leads u® to the consideration of another charge given by the judge, or rather his response to a question propounded to him by the jury.
The judge, in declaring the law to the jury, told them that “before the 17th March, 1836, there were three modes by which a person could manumit a *275 slave : 1st, by writing, with five witnesses to it, (this might be done before a judge, or elsewhere;) 2d, by verbally manumitting him in the presence of five witnesses; 3d, by will duly executed.” And he might have added another : by marrying his slave he emancipates her; for such is the Spanish law. These means of emancipating a slave are taken ¡rom Partidas, and no doubt it is the Spanish law, and was in force in Mexico so long as it was comprised in the dominions of the King of Spain; because slavery was established in all of the American dominions of the King of Spain, and it was the policy of the king to sustain it by his laws, not only for the purpose of cultivating the soil, blit because the trade in slaves was a most cherished and lucrative' branch of his commerce. It was not the policy of the crown to encourage emancipation, and its exorcise was regulated by law. Whether these laws were borrowed from Roman jurisprudence or originated from any other source is not material to us. They were made the law by the royal ordinances of Spain, and continued to be the only means by which a master could manumit his slave. As soon, however, as Mexico had established her independence of the crown of Spain, a different policy was proclaimed. It was the policy to put an end to slavery within the shortest possible period of time. Under this change of policy, is it not perceived that the reasons for continuing in force the laws of the King of Spain on this subject had entirely ceased to exist, and indeed are repugnant to the new policy adopted? Anil although there may not have been a direct action of the Legislature abolishing those laws, it is an old maxim, so old that, as an acknowledged truth it is almost affectation to repeat it, that where the reason of the law ceases the law itself ceases. It would be absurd to suppose that under such circumstances a man would be told that you can only surrender the dominion you have over your slaves as property by the strict observance of old laws, ordained and promulgated under circumstances so very different. But the absurdity would be still more glaring to say to the person in whose favor the master has abandoned voluntarily his rights as owner: It is true your master will not own you as his slave, and treats you as free, and has shown this his determination by acts and words, in hundreds of ways. You are still his slave, whether he owns you or not. If he will not own you, your status is not changed. You owe a vagrant allegiance to some master, because your old master lias not conformed to some antiquated law that it would be as unreasonable to require the observance of as that of the Mosaic law to effect the same object. We believe, then, that in Texas, prior to the 17th of March, 1836, a master could let his slave go free without pursuing either of the modes declared by the judge. The court will not presume anything against this right until it is shown to be against law. (Jones v. Laney et al., 2 Tex. R., 342.)
The jury asked the judge if a person destroyed all evidence that the slave was his propertjr, if it would make such slave free. The judge responded that it would not. The question was put so broad and general that the answer would not be considered erroneous. But if it had been : Suppose the master destroyed all such evidence with an express avowal at the time, or afterwards acknowledges, that it was to enable his slave to go free. It is believed that in Texas, before the 17th March, 1836, (that being the point of time conceded by the pleadings at which the Constitution took effect,*) it would have been sufficient to make the slave free. And this conclusion is derived from the policy of the Government of Mexico, manifested by her various acts and decrees. Whether valid as laws operating on slave property in Texas or not, *276 these laws and decrees show conclusively a determined hostility to the institution of slavery.
Note 98. — Lewin v. Houston, 8 T., 94; Bailey v. Hieks, 16 T., 222; Hollingsworth v. Hols-housen, 17 T., 41.
Note 97. — Galvib v. Cloud, 14 T., 53.
The legal effect, then, of the paper referred to, would tend to raise the presumption that he had released the slave, if she ever was his, from slaveiy. If she had paid the purchase-money for herself, it would be another ground to support this presumption. From the record as' presented it is doubtful whether the relation of master and. servant did ever exist between the plaintiff and the •defendant’s intestate. The legal deduction from the acts and declarations (verbal as well as the written are referred to) of Smith was in favor of the freedom of the plaintiff below; and whether such presumptions are explained or •rebutted was a question for the jury. For the errors we have noticed the judgment must be reversed and the cause remanded.
Judgment reversed.

 Note. — The precise time when the Constitution went into operation was not discussed. It seems to have been assumed in the argument of the case that it was on the 17th March, 1S3G; and it not being controverted, the court did not feel called on to do more than to discuss the questions that necessarily arose, and did not decide whether it was operative from that date or from the date of its adoption. It could only be important to the parties in the event of the evidence showing that she was not emancipated before the 17th of March, 1836, but subsequently thereto, and before the Constitution was adopted.